Amos M. Switzer and Joseph Eastwood v. Pinconning Manufacturing Company.

*Contract—Construction of—Facts and circumstances attending its making to be considered—If executory, and ambiguous in its terms, the construction placed upon it by the parties is entitled to great weight—Impossibility of performance—Warranty.*

1. "The facts and circumstances attending the making of a contract, are indispensable to its correct construction or interpretation; and if executory, and its terms uncertain or ambiguous, the manner in which the parties have treated it, in carrying it into effect, is entitled to great weight as affording a practical construction which they have placed upon its intent and meaning."

2. "Where no express or implied provision, as to the event of impossibility of performance, can be found in the terms or circumstances of an agreement, it is a general rule of construction, founded on the absolute and unqualified terms of the promise, that the promisor remains responsible for damages, notwithstanding the supervening impossibility."

3. "It is also a rule of construction, that every word and sentence shall be given effect, where it is possible to do so without destroying the manifest intent of the parties."

4. "While no particular form of words is required to constitute a warranty, nor is it necessary that the word "warrant" should be used to make such a contract, still it is necessary that such expressions should be used as show the intention of the party to bind himself in a given direction."

5. Applying above rules to the contract in this case, and the facts and circumstances attending its making, as detailed in the opinion,

*Held,* that the provision in the contract, relating to the sale of the "joists, scantling, small timber and shipping culls," is entirely independent of the prior clause providing for the sale of "uppers" and "common"; that it is a sale of the *coarser* grades of lumber, manufactured from the *same* logs from which the "uppers" and "common" lumber were agreed to be cut, but formed no part of the 2,000,000 feet mentioned in said prior clause.

*Held,* further, that the amount of such higher grades of lumber which defendant contracted to deliver, was measured by the amount which could be cut from "logs then in the pond and from section thirteen," and that the designation of the quantity of 2,000,000 feet, was a mere statement of opinion and not a warranty.

Error to Bay. (Green, J.) Argued January 19, 1886. Decided February 3, 1886.

Assumpsit. Defendant brings errror. Reversed.

The facts are stated in the opinion.

*Hatch & Cooley*, for appellant:
Brief confined to an argument upon the facts.

*Holmes & Collins* for plaintiffs:
Where the execution of an indefinite or ambiguous executory contract necessarily involves its practical construction, the practical interpretation of the parties is entitled to great, if not controlling influence : *Chicago v. Sheldon*, 9 Wall. 54; and where an instrument is susceptible of two constructions, the one working injustice and the other consistent with the right of the case, the latter should be favored : *Noonan v. Bradley*, 9 Wall. 407; and where a clause in a contract admits of different constructions it should be given that which will cause it to have some operation rather than that which will deprive it of effect: *Evans v. Sanders*, 8 Porter, 497; *Archibald v. Thomas*, 3 Cowen, 290.

The reference in the contract to the locality in which the logs were situated, does not limit the lumber, in amount, to what could be cut from logs in such locality, and the defendant should not be permitted to take advantage of the discrepancy between its representations and the facts. By furnishing the amount of lumber contracted, as good in quality as that from the locality in question, would be a substantial performance of the contract, the only practicable office of this clause being to determine the quality of lumber to be furnished. The defendant is bound to deliver the contracted amount or respond in damages for his failure, even if as a matter of fact, there was not this amount in the pond and on section thirteen : *Keystone Company v. Dole*, 43 Mich. 370 ; *Wetmore v. Pattison*, 45 Mich. 439 ; *Lampson v. Cummings*, 52 Mich. 491 ; *Williams v. Vanderbilt*, 28 N. Y. 217; 2 Parsons on Contracts, pages 672 and 673 and notes; Bishop on Contracts, § 217.

Under a contract for the sale of articles to be manufactured, containing the quality of the various grades of such articles, it becomes the duty of the seller to furnish a medium quality of the same: *Howard v. Howey*, 22 Wend. 350 ; *Hargous v. Stone*, 5 N. Y. 86.

CHAMPLIN, J. This action is brought upon an alleged contract claimed to have been made on the twenty-seventh day of February, 1883, between the parties, by which the defendant agreed to and did sell to plaintiffs certain white pine lumber. The contract declared upon is as follows:

"This agreement, made this, the twenty-seventh day of February, 1883, between the Pinconning Manufacturing Company, of Pinconning, Michigan, of the first part, and A. M. Switzer & Company, of Bay City, Michigan, of the second part, witnesseth: The said party of the first part hereby agrees to sell and does sell to said party of the second part, two million (2,000,000) feet of white pine lumber, to be cut from logs now in the pond, and logs to be cut from section 13, town 17, range 3 east, during the season of 1883; said lumber to be cut without any unnecessary delay, and to be cut into such widths and thicknesses as the party of the second part may direct from time to time, all to be well piled, lengths, thicknesses and widths separate, and as nearly graded as possible; said piling to be open, with not less than two crossers, said crossers to be placed directly over each other, and piles to be well covered with cull lumber when finished.

"And the said parties of the second part agree to purchase the above lumber of the party of the first part, and to pay for the same at the rate of thirty (30) dollars per M. feet for uppers, and twelve (12) dollars per M. feet for common, free on board cars at Pinconning, to be loaded from time to time in such quantities and qualities as they may direct, provided the same shall be ready for shipment.

It is further agreed between the above parties that the inspection shall be that known as 'Saginaw River Cargo Inspection,' the inspection to be done by the said parties of the second part at their own expense, and in case any dispute shall arise in regard to the inspection of the above lumber it shall be referred to a competent Saginaw river inspector, to be mutually agreed upon, the expense of the same to be paid by the party in the wrong.

And the said party of the first part also agrees to cut and sell to the said parties of the second part all the joists, scantling, small timber and shipping culls that may be manufactured from the logs as heretofore described, at the following prices: For joist, scantling and small timber eight dollars per M. feet, board measure, and for shipping culls seven dollars per M. feet, to be delivered free on board cars at Pinconning, as directed by the parties of the second part; said

joists, scantling and small timber to be of a good merchantable grade. And the said party of the first part agrees to cut and pile all of the above lumber during the season of 1883. And the parties of the second part hereby agree to purchase the same at prices and on conditions as above mentioned.

And the parties of the second part agree to advance to the party of the first part their notes as follows: On March 1, 1883, their note at three months from date for two thousand dollars; on March 15, 1883, their note at three months from date for two thousand dollars; on April 10, 1883, their note at three months from date for two thousand dollars; on May 1, 1883, their note at three months from date for two thousand dollars; and on May 20, 1883, their note at three months from date for two thousand dollars. And the said party of the first part agrees to take the said notes of the parties of the second part, and to pay all discounts and interest on the same, and to apply the said notes on the purchase of the said lumber.

" And it is also agreed by the party of the first part that in case the said parties of the second part shall not have shipped sufficient lumber, at the prices above named, to cover the amount of said note or notes as they may mature, the said party of the first part hereby agrees to renew the same for another three months without cost or charges to the parties of the second part; and the said party of the first part also agrees to insure said lumber, making policies payable to the order of F. P. Browne, cashier of the Bay National Bank of Bay City, for a sum sufficient to cover the amount of said notes, or what portion of them may not have been paid in lumber, in case the said lumber should be destroyed by fire.

" It is further agreed by the party of the first part that all pine logs now in the pond, or on the mill yard, or that may be put into the pond, or on the mill yard, at Pinconning, and all lumber cut from the same, except mill culls, shall be the property of the parties of the second part as security for all notes given and to be given by the parties of the second part to the party of the first part from time to time as advances on said lumber, until sufficient lumber has been delivered to the parties of the second part to cover all outstanding notes or advances made by them, excepting such lumber as may be required by the party of the first part for its own use. And it is further agreed by the parties of the second part that when the said notes before mentioned are paid in lumber, they shall give their notes at sixty days, or good commercial

paper of their customers, endorsed by them, on the same time, for all lumber as ,fast as shipped.   It is further agreed that no lumber known as 'shorts' shall be received on this contract.   And it is further agreed that the parties of the second part shall have the option or refusal of the remainder of the cut of white pine of the mill for the present year from the party of the first part, at prices and on terms as above mentioned, leaving and reserving from said contract all coarse logs known as 'shingle logs.'

"PINCONNING MANUFACTURING COMPANY,
"By WILLIAM MERCER, Pres.,
"C. V. PLUMMER, Sec'y."

The main controversy in the case involves (1) the existence of the contract declared upon, and (2) the amount and quality of lumber affected by it.

The first point is based upon the fact that there are two contracts bearing date the same day, and of exactly like tenor and effect, except that in one the land from which the pine was to be cut was described in "range three east," and in the other as being in "four east." The defendant owned no pine land in section 13, township 17 N., range 4 E., but it did upon section 13, township 17 N., range 3 E., and it had a railroad running from this section in range 3 E. to its mill for the purpose of transporting logs. At the time of the sale by defendant and purchase by the plaintiffs, there were two contracts drawn which the parties supposed to be duplicates; and the contract describing section 13 as being in township 17 N., range 3 E., was subscribed by defendant and delivered to plaintiffs, and the other the plaintiffs signed and delivered to the defendant. The writings, upon their face, do not profess to be duplicates, and the testimony is clear that the one delivered to, and sued upon by plaintiffs, expresses the true intent of the parties, and there is no reason to question its existence.

The second point above stated seems to be the one most relied upon by defendant. The defendant contends that under the contract the plaintiffs were entitled to receive only what timber there was on the pond, and upon section 13 ; that if it fell short of 2,000,000 feet the plaintiffs were not

entitled to the deficiency ; that the instrument should be construed as if it read:

"All the lumber which can be made from the logs on the pond and on the section, not exceeding two million feet; that there is no warranty that these two sources of supply should yield the quantity called for; that the plaintiffs are only entitled to receive two million feet of all grades, viz. : uppers, common, bill stuff, and shipping culls."

But if these views are not accepted by the court as the correct construction of the contract, then another view is suggested, viz. : That the first paragraph provides for cutting and selling 2,000,000 feet of lumber, from the logs in question, of all grades; *i. e.*, all merchantable grades; and that the second paragraph provides for cutting and selling, in addition, all of the two grades of bill stuff and shipping culls which the entire lot of logs contains.

The contention of the plaintiffs is, that the contract is one for the sale of 2,000,000 feet of upper and common lumber, to be thereafter manufactured, and the "joists, scantling, small timber, and shipping culls," that could be made from the logs from which the 2,000,000 feet of upper and common lumber should be made.

The facts and circumstances attending the making of a contract, are indispensable to a correct construction or interpretation thereof, and if it is executory, and its terms uncertain or ambiguous, the manner in which the parties themselves have treated it, in carrying it into effect, is entitled to great weight as affording a practical construction which the parties themselves have placed upon its intent and meaning. The material facts surrounding the making of the contract in question, and its execution, may be summarized, as follows:

On, and for some time prior to the twenty-seventh day of February, 1883, the plaintiffs were partners in the business of buying and selling lumber, and had a lumber-yard at West Bay City.

The defendant is a corporation, organized under the laws of this State, and at the time above mentioned was the owner

of certain pine land, and a saw and shingle mills, and was engaged in the manufacture and sale of lumber, lath, shingles, staves, barrels, and wood, and the purchasing or cutting of logs and timber in connection therewith. Its mills were situated adjacent to the Jackson, Lansing & Saginaw Railroad, at the village of Pinconning.

Adjacent to the defendant's mill, and extending about three-quarters of a mile northwesterly therefrom, was a pond fed by a small stream called Pinconning river, and on the banks of this stream, about half a mile above the upper end of the pond, was a banking ground where logs were banked during the winter, to be afterwards run down the river to the mill. A railroad from a junction of the Jackson, Lansing & Saginaw Railroad, near the mill, extended northwesterly across township 17 N., range 4 E., across and beyond section 13, in township 17 N., range 3 E., and on this section defendant owned 400 acres of land.

On the twenty-seventh day of February defendant had in the pond, and on the banks thereof, 637.971 feet of white pine saw logs that would run about ninety per cent. to mill culls, and very little, if any, to the grade known as " uppers," and not more than ten per cent. of which would make merchantable lumber of any grade, and all, or the greater part thereof, had been deposited there before the twenty-first day of February, 1883. Above the head of the pond, at the banking ground, defendant had about 1,346,286 feet of white pine logs that would run about $\frac{2}{3}$ to mill culls, and very little to the grade known as " uppers." At this time there was about 815,000 feet of white pine timber on the lands owned by defendant, in section 13, township 17 N., range 3 E., that would make lumber running about 8 4-10 per cent. to the grade known as " uppers; " and on the balance of the section, not owned by defendant, there was about 300,000 feet of white pine which would make lumber running about 4 3-10 to uppers.

For some time prior to February 21, 1883, there were negotiations between the plaintiffs and defendant for the sale, by the defendant to the plaintiffs, of pine lumber yet to be

sawed, and on or about the date last mentioned Mr. Mercer, the president of the defendant company, and plaintiffs, went together to said banking ground and across the pond and saw the logs there, and Mercer then said to plaintiffs that defendant would let them have lumber, made from logs cut from said section 13, and that the timber from that section was as good, or better, than certain logs then shown them, which would run from six to ten per cent. to uppers, and would run from nine to ten per cent. to uppers; and afterwards the contract declared upon was made on the twenty-seventh day of February, 1883.

Previous to the execution of this contract the plaintiffs had never examined the timber on section 13, nor had either of them any knowledge of the quantity or quality thereof, and no information except such as they derived from the statements of Mr. Mercer; nor did either of the plaintiffs know whether defendant owned all or any part of said section.

After the execution of the contract the defendant went on and sawed and delivered all the lumber from the logs in the mill-pond, and at the banking ground, which, upon inspection, was found to be of the grades known as "uppers," "common," "bill stuff," and "shipping culls," and the same was accepted by the plaintiffs and applied upon the contract, amounting in the aggregate to 1,178,979 feet, of which 941,857 feet were uppers and common. During the summer of 1883, defendant purchased of other parties 700,000 feet of white pine logs, which it sawed and delivered under said contract, that upon inspection was of the required grade. Defendant also cut upon said section 13 about 215,000 feet white pine logs, and sawed the same during the summer of 1883, and all of the lumber made therefrom which, upon inspection, was of the required grade it delivered to plaintiffs to be applied upon its contract. About the end of the year 1883, the defendant sold its mill and pine land to Mansfield, Smith & Co., who thereupon took possession of said property.

The total amount of lumber delivered under the contract amounted, in the aggregate, to 1,567,377 feet, of which 979,438 was uppers and common.

At the time of the sale of the mill and pine land there remained on section 13, which had not been cut, belonging to defendant, 600,000 feet of white pine that would run eight and four-tenths to uppers. In order to complete the delivery of 2,000,000 feet of lumber, of the grades of uppers and common, required 1,020,562 feet. The plaintiffs requested the defendant to deliver the balance of said lumber, but it has neglected and refused to do so, and did not intend to saw and deliver any more lumber on the contract, but did expect and intend that Mansfield, Smith & Co. would saw and deliver, to plaintiffs such lumber as they, under their contract, were entitled to receive in addition to that already sawed, and plaintiffs were so informed; but Mansfield, Smith & Co. refused to carry out such contract.

In putting a construction upon this contract it appears to me quite clear that the provision relating to the sale of the joists, scantling, small timber, and shipping culls, is entirely independent of the other clause relating to the sale of the lumber known as "uppers" and "common." It is a sale of the coarser grades of lumber manufactured from the same logs, and while it includes all the lumber of this kind that may be manufactured from the logs referred to in the preceding paragraph, these coarser grades form no part of the 2,000,000 feet named.

The main question in the case is whether the amount agreed to be sold, namely the 2,000,000 feet, is limited by the contract to the quantity of the two grades of uppers and commons as can be cut from certain specified logs; and this question only becomes important when, by subsequent events, it turns out that the logs specified do not contain 2,000,000 feet of the required quality. If the contract limits the lumber to be cut and delivered to the logs specified, and there is a shortage in quantity, then the promise to deliver 2,000,000 feet becomes impossible of performance. This was a contingency which might arise in the execution of the contract, and the question is, does it show an intention to bind the defendant to perform the delivery of 2,000,000 feet at all events; or does it show an intention to contract with a par-

ticular state of facts subsequently to be ascertained, limiting the effect of the contract, under the circumstances, to the quantity developed by the manufacture of the logs into lumber?

It is well settled that "where no express or implied provision as to the event of impossibility can be found in the terms or circumstances of the agreement, it is a general rule of construction, founded on the absolute and unqualified term of the promise, that the promisor remains responsible for damages, notwithstanding the supervening impossibility."

While the agreement to sell 2,000,000 feet is positively stated, yet it is a part of the agreement of sale that the lumber sold shall be cut from logs then in the pond and upon section 13. Here, it seems to me, is an implied provision in the terms of the agreement as to the event of impossibility of there being that quantity of the grades named in the logs specified from which the lumber is to be cut. And this view is in harmony with the undertaking of the plaintiffs which is not to pay a gross sum for the 2,000,000 feet, but at the rate of thirty dollars a thousand for uppers and twelve dollars for common.

It is suggested by plaintiffs' counsel that the mention of the logs from which the lumber was to be cut was inserted merely for the purpose of defining the quality of the lumber. But this would be unnecessary, as the subject of quality is determined by another stipulation which provides for inspection. It is also a rule of construction that every word and sentence shall be given effect where it is possible to do so without destroying the manifest intent of the parties. It is not perceived what office the words "to be cut from logs now in the pond, and logs to be cut on section 13, town 17, range three (3) east," are to perform, if they are not to limit the lumber sold to the logs specified. I think these words show a plain intention to limit the quantity sold and confine it to the logs mentioned. And I do not think the defendant warranted or guaranteed that there should be 2,000,000 feet of the grades of upper and common in such logs.

While no particular form of words is required to constitute

a warranty, nor is it necessary that the word "warrant" should be used to make such a contract, still it is necessary that such expressions should be used as show the intention of the party to bind himself to make good the quantity named, and not a mere statement or expression of opinion as to the quantity of lumber which could be manufactured from the logs from which it was to be cut. I do not think the language used in the contract shows that it was the intention of the defendant to bind itself to make good the deficiency, if any there should be, in the logs from which the lumber was to be cut, but the designation of the quantity was a mere statement of opinion as to the quantity, and cannot be regarded as a warranty.

It follows that the views entertained by the circuit court were erroneous upon the point above discussed.

There is nothing in the record to show that the lumber made from the logs which defendant purchased, sawed and delivered under the contract was received in lieu of any of the lumber agreed to be cut from the lands on section 13, and consequently the plaintiffs are entitled to damages for the lumber which defendant failed to cut and deliver from section 13.

The judgment must be reversed and a new trial ordered.

The other Justices concurred.