EMMA E. T. SAMPLE AND HENRY M. CAMP v. THOMAS PICKARD AND ALBERT B. UPTON.

*Sawing contract—Advances—"About" defined—Release of surety.*

1. It is well settled that, while the term "*about*" a certain amount is not precise, it does nevertheless indicate an approximation in quantity.

    So *held*, where a sawing contract recited that the first parties owned about 4,000,000 feet, board measure, of saw-logs, in certain designated streams, which they agreed to turn over to the second parties to be sawed, with power to sell shipping grades and re-imburse themselves for an advance of $20,000 out of the proceeds, and it is held that the meaning of the contract was that there should be enough logs of proper quality to yield somewhere in the neighborhood of 4,000,000 feet, board measure.

2. This case involves the construction of a sawing contract, and the alleged release of one of the defendants from liability thereon, and an examination of the opinion is necessary to a full understanding of the questions decided.

Error to Saginaw. (Gage, J.) Argued February 14 and 15, 1889. Decided April 12, 1889.

*Assumpsit.* Defendants bring error. Affirmed. The facts are stated in the opinion.

*Fancher & Dodds* (*D. P. Foote* and *C. S. Draper*, of counsel), for appellants.

*Wheeler & McKnight* (*B. Hanchett*, of counsel), for plaintiffs.

CAMPBELL, J. Plaintiffs sued defendants under the following contract:

"Memorandum of agreement made this 4th day of May, 1883, between Albert B. Upton and Thomas Pickard, constituting the firm of Pickard & Upton, of Mt. Pleasant, Michigan, parties of the first part, and Emma E. T. Sample and Henry M. Camp, constituting the firm of Sample & Camp, of Saginaw, Michigan, witnesseth:

"Whereas, said first parties own about four million feet, board measure, of white pine saw-logs, now in Chippewa river and its tributaries, marked 1, 2, 3, 5, 6, 7, 8, 9, 19, E. P. & 14, 5; and whereas, said second parties own a mill in East Saginaw: Now, therefore, it is agreed said first parties turn over to said second parties the above-named logs, delivered in the Tittabawassee boom, and said second parties shall convert the same into lumber, dock and sell the lumber manufactured therefrom in good and workman-like manner, so as to get the greatest return therefrom, shall pay boomage, inspection, and insurance thereon, and guarantee the collection of paper received for said lumber. The proceeds of said lumber shall be divided between said parties, as follows: The amount paid for boomage, inspection, and insurance shall first be deducted from said proceeds, and first party shall receive four dollars and seventy-five cents ($4.75) per thousand feet for shipping culls, twelve dollars for common, and thirty dollars and fifty cents for uppers; and said second parties shall receive two dollars and fifty cents for selling, sawing, and guaranteeing sale:

"Provided, always, that if the net proceeds shall not be sufficient, or shall be more than sufficient, to pay the said parties the amount due mentioned, then they shall receive in the same proportion that said amounts bear to the amount of said net proceeds. And it is expressly agreed that said first parties shall take the mill-culls or non-shipping lumber manufactured from said logs, and shall pay unto said second parties two dollars and fifty cents per M. feet for sawing the same.

"And whereas, said second parties have given to said first parties four promissory notes for five thousand dollars each, payable, respectively, in three, four, five, and six months from this day: Now, therefore, it is agreed that the said second parties shall retain the said first

parties' proportion of the net proceeds of said lumber until they shall have retained the said sum of twenty thousand dollars.   And it is further agreed that the interest shall be adjusted between the said parties at seven per cent. per annum; that is to say, if the said second parties shall pay any of said notes before receiving sufficient funds from said first parties' proportion of the net proceeds of lumber sales to meet the same, they shall charge said first parties interest until sufficient funds shall have been received; and, if said second parties shall receive funds from said first parties' proportion of net proceeds before the maturing of said notes, they shall pay interest thereon to the said first parties until the maturing of said notes.

" In testimony whereof the parties have hereto set their firm names.                          PICKARD & UPTON.
                                    "SAMPLE & CAMP."

Not far from the date of this agreement John O. Leaton became associated with Pickard & Upton.   On October 23, 1883, Pickard sold out his share in the firm to Leaton & Upton, who agreed to assume the indebtedness, and save Pickard harmless.   The notes advanced by plaintiffs were renewed with Leaton & Upton's indorsement, and paid by plaintiffs.   The logs referred to in the contract turned out to be dead and wormy, except a small proportion of sound green logs.   The amount of good lumber, including shipping culls, common, and uppers, was not far from a million feet.   There was conflicting testimony on the trial as to the propriety of putting among the mill-culls some lumber that defendants claim should have been reckoned of higher grade.   This difficulty is claimed to have arisen from the discoloration of some of the lumber when it left the saw, supposed to arise from bad condition, but disappearing when dry.   It was further claimed that some of these culls could have been resawed into narrower strips, yielding good lumber for a part of the width of the whole.   On the other

hand, it was claimed that this lumber brought more as mill-culls of full width than it would have yielded in any other form.    The lumber of the kinds which plaintiffs were themselves to sell under the terms of the contract fell much short of what was due plaintiffs.    They claimed that they were allowed to sell mill-culls also by separate authority, and did so to the general advantage.    The entire amount due plaintiffs for their advances exceeded what they collected by $10,348.69, as found by the jury.

The declaration, in addition to the common counts, contained a count setting up failure to furnish the logs provided for in the contract.    It was under the special count that the case was chiefly tried.    Defendants gave notice under their plea that plaintiffs were in default for not converting the logs into such lumber as was agreed on, or selling it properly; and further alleged a conversion of the mill-culls and shipping lumber.    Pickard also pleaded a release.    The ground of this claim was that, by arrangement with Leaton & Upton, Pickard had become liable only as a surety, and was released by plaintiffs' dealing with them separately, and by departures.

The chief contention before us was that the contract referred to the logs just as they were, and contained no express or implied agreement as to the quantity of lumber which they would yield; and it was in the same direction claimed that plaintiffs put in their $20,000 as their share in the venture, and must bear the loss. Upon an examination of the contract it will be seen that the risks which are referred to relate entirely to the grades included in shipping lumber; that is, to shipping culls, common, and uppers.    It was agreed that out of the net sales of this lumber plaintiffs should have $2.50 a thousand for their charges, and defendants should have for the various grades named, respectively, $4.75, $12, and $30.50 a thousand.    If the lumber sold at higher

prices than would pay these sums to both parties, the profits were to be divided according to those shares. If for less, the loss was to be apportioned in the same way. For the mill-culls plaintiffs were to have only $2.50 a thousand for sawing, and they were to belong to defendants. The provision for plaintiffs advancing the $20,000 came after and was independent of the foregoing conditions. The contract very plainly makes this a personal, and not a joint-stock, advance, and defendants were in any event to refund it themselves without diminution, and plaintiffs were to retain it out of defendants' share before paying over anything; and the only lumber out of which these funds were to come was the shipping grades. It does not appear that plaintiffs knew anything about the quality of the logs before they were delivered. The declaration is not based on any claim of fraud, but, so far as the special count is concerned, upon the failure in quantity of logs requisite to produce shipping lumber. The common counts would, however, cover the unrepaid advances.

Reliance is had by defendants on the case of *Switzer v. Manufacturing Co.,* 59 Mich. 488 (26 N. W. Rep. 762), to support the claim that plaintiffs had no right to rely on any idea that the logs would yield any particular amount of lumber or of particular kinds of lumber, and that they ran the risk of the funds falling short. In that case the suit was not brought to recover on account of advances made, and not sufficiently secured by lumber. It was a simple agreement to sell 2,000,000 feet of upper grades, to be cut from logs in the mill-pond, and logs on a certain parcel of land named. The mill-pond logs and those on the land combined fell short of yielding 2,000,000 of upper grades. It was there held that no particular words were necessary beyond an intention to make good the quantity named, but that in that case the

intention did not appear to do more than furnish what the particular logs would yield. In that case there were but two grades to be furnished to the extent named, and at the price of the lowest grade a million feet of that grade would more than repay the advances. And there was no agreement to sell the whole product of the logs if it should exceed 2,000,000 feet of those grades. The logs as a body were not covered by the contract, and it was only on the contingency of a limited yield that they could all be involved.

It seems to us that the present contract does not stand on the same footing. Here the logs were not owned by the party sawing them, whose business was only to saw them into every grade possible, and to get pay out of sales of only a part of the lumber, which was to be sold at joint risk, so far as prices were concerned. For the non-shipping grade or mill-culls plaintiffs were to be paid only for sawing, leaving the whole property in those to defendants. No matter what prices those might bring, plaintiffs had no interest in them. When this contract recited that defendants owned about 4,000,000 feet, board measure, of white pine saw-logs in the Chippewa river and its tributaries, bearing certain marks, and agreed to turn them over to plaintiffs to be sawed, giving plaintiffs power to sell shipping grades and re-imburse themselves for an advance of $20,000 out of the proceeds, retaining all the mill-culls for defendants, and paying plaintiffs for sawing them, there was no consideration for plaintiffs assuming these functions and running these risks, except the reasonable reliance on a sufficiency of logs to render it profitable. It is well settled that while the term used, "about" a certain amount, is not precise, it does nevertheless indicate an approximation in quantity. If the logs in question had been of average soundness, the proportion of shipping lumber must necessarily have gone beyond

what was necessary to repay all advances and yield a profit. Plaintiffs took the risk of prices of shipping grades not receding below the sums contemplated, but it is not claimed they did recede. That the contract means that there should be enough logs of proper quality to yield somewhere in the neighborhood of 4,000,000 feet, board measure, seems obvious. That is what was recited, and without it the contract can hardly be said to have a consideration. It certainly has no other that is definite. There was testimony that board measure meant the measure of such resulting lumber as was above the grade of mill-culls. This testimony was admissible, and is in harmony with the body of the contract which confined plaintiffs' interest to those grades. As the damages were confined to plaintiffs' balance for advances, which were to be paid out of those proceeds, and included nothing beyond, we see no difficulty in maintaining the recovery.

The court charged the jury very fully and fairly upon the effect of mixing better lumber with the mill-culls, and upon the liability of plaintiffs for sales of mill-culls. They were held to the full value of all lumber so put in with the mill-culls, whether sold by themselves or turned over to Leaton & Upton, and the jury could not have been misled by those instructions. They are not complained of, if the effect of what was done was not to discharge Pickard. But it is claimed he was discharged by these and other dealings to be referred to.

Several instructions asked all went upon the theory and demand that Pickard was discharged entirely, and not partially, by what plaintiffs did after he sold out to Leaton & Upton. These requests insisted that Pickard was absolutely discharged by either of these things:

1. By knowingly putting better lumber with the mill-culls, and selling or disposing of it as mill-culls, without Pickard's consent.

2. Or without the consent of one of his firm.

3. Or by putting into the mill-cull piles any lumber subject to plaintiffs' claim, without Pickard's knowledge.

It is also claimed, apparently, that Pickard was discharged by the dealings with Leaton & Upton in getting renewed indorsements.

If Pickard had been the principal debtor on these notes, or if this suit had been brought by some holder of them against Pickard, the extension of time to Leaton & Upton might have some bearing. But he is not sued on any such basis. Plaintiffs themselves gave those notes, and paid them. Their proceeds, when first given and discounted, constituted the advances made to Pickard and his associates. Those advances were to be repaid out of the special fund to be raised by sale of the lumber. And the suit against him and Upton is because they did not furnish the means of raising that fund. There has been no transaction changing that arrangement. The whole claim of a discharge by plaintiffs' management of the lumber is fallacious. It was one of the terms of the contract that plaintiffs should have the sawing and disposition of the lumber. There was never any change of that contract. Plaintiffs were bound to act fairly, in accordance with its terms. If they failed to do so, they were responsible to the extent of such failure. But there is no rule which would discharge a debtor by reason of such mismanagement beyond the extent of the loss by it. To this extent the charge of the court held the plaintiffs liable, and the jury have settled that question. But a breach of duty is a very different thing from a change of relations. Pickard was interested in having the property pay as much as it would, under proper management, and no more. We think the charge did him no wrong.

We find no error in any of the matters laid before us

on the argument, and the judgment must be affirmed, with costs.

SHERWOOD, C. J., CHAMPLIN and MORSE, JJ., concurred.