OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.

---

## MOORE v. ANDREWS.

1. CONTRACTS—CONSTRUCTION BY PARTIES—QUESTION FOR JURY.
    Where a contract between a corporation and its manager as to compensation for his services was obscure and ambiguous, and it was defendant's claim, supported by evidence, that for several months the . contract had been construed by both parties according to his contention, he was entitled to have such question submitted to the jury.

2. SAME—REQUESTS TO CHARGE—INSTRUCTIONS.
    It was error for the court below to refuse defendant's re-
    . quested instruction that, if the jury should find that in the method of keeping the books and rendering monthly statements to the corporation, the parties adopted a method of construing the contract, the jury should adopt the same method of construing the contract in arriving at a verdict.

3. SAME—TRUSTEE IN BANKRUPTCY.
    Where the trustee in bankruptcy of a corporation, in a suit

against the corporation's former manager, is relying upon a contract which the corporation had a right to make, he is bound by the terms of the contract.

4. TROVER—CONVERSION—MONEY.

An action of trover will lie against the former manager of a bankrupt corporation, at the instance of the trustee in bankruptcy, for money belonging to the corporation which he unlawfully retains, after it has been demanded.

Error to St. Clair; Law, J. Submitted June 18, 1918. (Docket No. 53.) Decided September 27, 1918. Rehearing denied January 21, 1919.

Case by Alex. Moore, trustee in bankruptcy of the Consolidated Fisheries, Incorporated, against Bert Andrews for the conversion of certain money of said corporation. Judgment for plaintiff on a directed verdict. Defendant brings error. Reversed.

*Burt D. Cady* (*Walsh & Walsh,* of counsel), for appellant.

*James A. Muir,* for appellee.

STONE, J. This is an action on the case, with a count in trover, for the alleged unlawful conversion of the money of the Consolidated Fisheries, a corporation. The plea was the general issue. Before plea there was a demand by the defendant for the particulars of the plaintiff's demand. The bill of particulars filed was for the wrongful conversion of the following sums of money at the times mentioned, viz.:

| | |
|---|---|
| June 30, 1914 | $689.72 |
| July 31,    " | 121.75 |
| August 25, " | 50.92 |

Upon the trial this bill was amended by adding $34 thereto. On the 28th day of January, 1914, the said corporation, through its authorized officers, entered into a written contract with the defendant which was as follows:

"This agreement made and entered into this 28th day of January, 1914, by and between Bert Andrews of Bay City, Michigan, hereinafter called Andrews, and the Consolidated Fisheries, a Michigan corporation, of Port Huron, Michigan, hereinafter called corporation.

"Witnesseth: That whereas said corporation is desirous of securing a general manager for its business and said Andrews represents himself as capable and experienced in all matters pertaining to the practical management of a commercial fishing establishment and the purchasing and selling of fish, and fish products; now upon those representations it is agreed as follows:

"Said corporation employs said Andrews as general manager, and said Andrews binds and engages himself for such work and agrees not to enter into any other employment, or to become interested in anything of a competitive nature for a period of five years from February 28th, 1914, which day will be the beginning of the term of services.

"Said Andrews agrees to devote all of his time and energy for said five years to further the interest of said corporation and agrees to faithfully account to the proper officers of said corporation, for any and all money and property entrusted to his care or handled by him.

"Said Andrews agrees to make full and true statements to the corporation directors, the first part of each month of the amount of fish, or other business handled during the previous month, and of the price paid and received therefor, and of the labor and services and expenses in detail, in connection with said business, and to keep at the office in the fish house of said corporation proper books of accounts in that respect, which books shall show in detail the affairs of said business as managed by said Andrews, and shall at all reasonable times be accessible to any officer or stockholder of said corporation.

"Said Andrews shall be allowed a separate bank account of two thousand ($2,000.00) dollars for carrying on the necessary business of said corporation and shall have authority to sign checks for same. Should said account be at any time over two thousand

($2,000.00) dollars, said Andrews agrees to turn over all money above said two thousand ($2,000.00) dollars to the treasurer of said corporation at his request.

"Said Andrews shall have for said period of five (5) years the full management of said corporation's business; buying and selling and producing of fish or anything else may be handled in such business, and the full control of its physical properties for said purpose, but he shall consult and counsel with the secretary or treasurer of said corporation so as to be informed of the financial condition of said corporation and of its ability to make purchases of any kind above said two thousand ($2,000.00) dollars, so that such officers may know of the plans and contemplated purchases and expenditures by said Andrews and acquiesce therein or disapprove thereof.

"Instead of salary, said corporation agrees to pay and said Andrews agrees to accept for said five (5) years' services, one-half of the net profits of said corporation during that term, except profits growing out of said corporation's own catch of fish hereinafter referred to. It is agreed, however, by said Andrews and said corporation that said Andrews' commission shall not exceed twenty-five thousand ($25,000.00) dollars, for the five (5) years' services, or, in other words, if said one-half of the net profits due said Andrews should amount to more than the twenty-five thousand ($25,000.00) dollars, during said five (5) years' services, then all in excess of this amount shall revert to and belong to said corporation.

"It is also agreed that while the management of the plant and equipment of business shall be in charge of said Andrews, the catch of fish shall be sold and disposed of in the same manner as purchases by said Andrews as manager and the moneys resulting shall be the property of the corporation, less the sum of two cents per pound, which two cents is that upon which a part of the commission of said Andrews is to be figured. It being further understood the expenses for running said fish house including ice shall be paid out of said two cents and the profits on the purchases and sales of other business outside of said corporation's own catch of fish and the said corporation will pay all other expenses.

"As a part of this contract, said Andrews agrees to purchase at par and pay for in cash to said corporation, on or before February 28, 1914, two thousand ($2,000.00) dollars of the capital stock of said corporation and it is agreed that at the end of said five (5) years, that if this contract be not renewed, that said corporation will repurchase all of said Andrews' stock at par, and said Andrews agrees to sell the same.

"Said corporation agrees that if there are any dividends, they will declare same semi-annually, in June and December.

"And each party hereto agrees to faithfully perform all the promises and undertakings in his or their behalf hereinbefore set up.

"In witness whereof, the said parties hereto have hereunto set their hands and affixed their seals in duplicate the day and year first above written.

"BERT ANDREWS,
"CONSOLIDATED FISHERIES, INC.,
"By C. R. OSIUS, Secretary and Treasurer.

"Signed, sealed and delivered in the presence of JAMES A. MUIR.

"The undersigned signatures are stockholders of the Consolidated Fisheries, Inc., and the above agreement is approved by them as signed below.

|                                      | Shares of Stock Par Value $10.00 each |
| ------------------------------------ | ------------------------------------- |
| Stockholders' names, P. O. Address   | Common                                |
| M. N. OSIUS, Port Huron              | 400                                   |
| CHAS. R. ELLIS, Port Huron           | 75                                    |
| JAMES A. MUIR, Port Huron            | 25                                    |
| C. R. OSIUS, Port Huron              | 136"                                  |

Early in March, 1914, the defendant went into the management of the business and continued until the fall of that year, when the corporation went out of business, and was later adjudicated a bankrupt in the Federal court. Later, the plaintiff herein was appointed trustee in bankruptcy, and this suit was brought claiming that the defendant unlawfully converted the said moneys of the corporation while he

was such general manager, under circumstances which entitled the plaintiff to maintain this action.

The case turns upon the construction that is to be given to the contract above set forth. It was the claim of the plaintiff, which claim was adopted by the trial court, that it was contemplated by the parties when they made the contract that the sole compensation or commission of the defendant was to be one-half of the net profits of the concern, including both its function as a dealer in fish, and its function as a producer or catcher of fish.

In directing a verdict for the plaintiff for the full amount of his claim, as stated above, the court, after reading the paragraphs relating to defendant's compensation, said:

"Now, gentlemen, the language of these two paragraphs of the contract, clearly divide the business of the corporation into two parts, first that of buying fish from other people from third parties, and selling them again. That is the function of dealing in fish. That is one part of the business of this corporation as it is to be managed by Andrews. Another part is fishing, catching fish, producing fish, as the contract says, and selling them.

"Now it appears to the court that the language in the 7th paragraph, that Mr. Andrews shall receive one-half of the net profits of said corporation during the term, is a controlling part of the contract. That is, it is contemplated by the parties, or it was contemplated by the parties, at the time, as appears from the language, that that should be the measure of his compensation. Now, in reference to the fish caught, it gives him two cents a pound upon the fish caught by the corporation, and it says, 'which two cents is that upon which a part of the commission of said Andrews is to be figured.' In other words, I think it is plainly contemplated, or was contemplated by the parties when they made this contract, that the sole profits, or sole commission of Andrews was to be one-half of the net profits of the concern, including

both its function as a dealer in fish, and its function as a producer, or catcher of fish. * * *

"Now, gentlemen, so far as the testimony shows in this case, the department of the corporation which caught fish, lost very heavily. That is, the contract, parts of which the court has read you, does not seem to contemplate there shall be any losses; it was evidently in the minds of the parties at the time they made the contract, that all would be clear sailing, and there would be profits all the time, and no losses. Now, there have been very heavy losses in the department that had to do with catching of fish, or producing of fish. As to whether there have been profits in the department devoted to the buying and selling of fish, is very much a disputed question here. Mr. Andrews rendered monthly statements, and has taken and retained the amount of $896.40, which he claims to be one-half of the net profits made by that part of the business that had to do with the buying and selling of fish. I have no doubt whatever but what Andrews is entirely sincere in this claim; I think he really believes that his system of keeping the books and retaining this money, is exactly in compliance with the terms of the contract, and the contract is somewhat obscure, it is a very difficult contract to construe, but the construction belongs to the court. * * *

"Taking this contract as a whole, under the testimony which has been given quite thoroughly here in court, I cannot see how there are any net profits in the business, one-half of which is to be given to Mr. Andrews. I cannot conceive of any reasonable theory of the construction of this contract, taking into consideration the language of the contract itself, and the circumstances surrounding the making of the contract; I cannot conceive any construction of the contract that would give Mr. Andrews any profits, hence, this $896.40 which he has does not belong to him, but belongs to the creditors of the corporation, who are here represented by the plaintiff."

It appeared in evidence upon the trial that negotiations between the defendant, on the one part, and Dr. Osius, the secretary and treasurer of the corporation,

and Mr. Muir, the attorney of the corporation, on the other part, had been pending for more than a month before the contract was finally signed on January 28, 1914.

At that time Dr. Osius and his wife were the owners of a majority of the stock, and Mr. Muir was the duly authorized attorney of the corporation. The defendant had submitted a draft of contract which did not suit Mr. Muir. On December 26, 1913, Mr. Muir wrote the defendant a letter and apparently either suggested a new draft, or referring to a prior draft of contract, which had been prepared by him. In that letter, among other things, he said:

"They want you to come here as manager, and if you want to come and invest $2,000 in the capital stock, come, and the corporation  *  *  *  will see that you are supplied with proper funds for the purchase of fish. It will give you one-half of the net profits of all fish bought from outsiders, and one-half of the net results of two cents per pound on its own catch, with the understanding that you are to have one-half of the net profits during the five years, up to $25,000."

The draft of contract submitted by Mr. Muir contained the following:

"For compensation, the corporation agrees to pay, and said Andrews agrees to accept for said five years' services, one-half the net profits of said corporation during that term, except that growing out of the catch of said corporation, hereinafter referred to, but not to exceed $25,000 during said term, it being understood that one-half said net profits for any year might be less than $5,000 but, if the total net profits during the term hereof, equal the sum of $50,000 said Andrews is to receive one-half thereof, but no more on account of such services. It is also agreed that, while the management of the plant and equipment of business, exclusive of said boats, shall be in the charge of said Andrews, the catch, or product of the catch shall be sold and disposed of, in the same manner as pur-

chases by said Andrews, as manager, and the moneys resulting shall be the property of the corporation, less the sum of two cents per pound, which two cents is that upon which a part of the compensation of said Andrews is to be figured. It being further understood that all expenses of said business, exclusive of running the boats, shall be paid out of said two cents, and the profits on the purchase and sale of other fish outside of the said catch and products of said corporation, and that the corporation will pay to man, fuel, repair, equip for navigation, and run said boats."

This letter and draft of contract were offered in evidence by the defendant "as showing the negotiations leading up to the contract that was really executed." The offer was objected to as immaterial and irrelevant, and the objection was at first sustained. After some discussion the court said, referring to the letter:

"Inasmuch as this is purely a question of construction for the court, in order to allow a record to be made, I will admit this, but I do not think there is any use of reading it to the jury."

And the draft of contract was "received in the same way." The defendant testified:

"I wrote back to him shortly after I received this letter from Mr. Muir. I don't think I received any reply from Mr. Muir to my letter. I had a talk with him the same day the contract was signed, only before it was signed and once before that. And as a result of that conference, the agreement which has been entered into, and offered in evidence, was entered into. I remember a clause in the last paragraph on the second page which says that the 'corporation will pay all other expenses.' * * *

"Q. Did you have such a conversation with him after you entered into the contract?

"A. On the same day.

"*The Court:* Was that after the contract was signed?

"A. Both before and after.

*"The Court:* Whatever talk you had about that clause after the contract was signed, on the same day, you may tell.

*"A.* I wasn't to pay any of the rents, that there was understood, no rents out of that part of it. Just as the contract reads; we talked that over, I wasn't to pay any rent for the fish house part. My salary, instead of salary, was to be commission. They paid the rents and I done the work there.

*"Q.* Was there any discussion as to what should be included in the expenses of the fish house account?

*"A.* Just the running part of the fish house, the men that I hired and he hired. That was talked before and after the contract. The same day, too.

*"Q.* What was the discussion as to what you should charge against the fish house, in the way of expenses?

*"*Objected to as not competent, and that the parties to whom he was talking had no authority to change or alter the contract.

*"The Court:* To whom were you talking?

*"A.* Dr. Osius.

*"The Court:* Go ahead.

*"A.* I was to pay for the men I had helping to pack up fish. If I didn't have any men, there was no men to pay, and what ice I used I was to pay for."

The defendant also testified that after taking possession, he opened a set of books, the same that had been offered in evidence.

"I entered these books in a double entry system with two accounts, the fish house account, and the corporation account. These books were kept according to that account all the way through, I did not act as manager of the company as the contract provided. I was the manager of the buying and selling of the fish, and supposed to be manager of the other part; but I wasn't. Dr. Osius was the manager of the other part. Dr. Osius ran the part of the business known as the corporation end of it. I ran the fish house end of the business, the buying and selling. I have upon the books of the corporation an account known as the fish house account. I entered upon that account the several items that should be credited to it, and charged

against it the several items that should be charged against it. That account shows a profit, a net profit of somewhere near $1,800. * * * I kept track of all the amounts and reported them to Mr. Muir. I have reported to the corporation all moneys that should be credited to that account, every cent of it, and also all moneys that should be charged against it, and after doing this it showed a net profit of somewhere around $1,800. That is what is known as the fish house account, and that is the part of the business I looked after. The part that Dr. Osius looked after showed a loss. * * * Dr. Osius looked at the books a good many times. I showed him the books. He did not make any comment about the books, except he said they were kept fine. He never objected to anything about the statement he had. He never made any objection to any charges I made on the different accounts. He never made any objections to the items that I put in the different charge accounts. I did furnish a monthly statement of the business transferred there. These eight slips represent the monthly statements. They are fish house statements. I made them out at the dates indicated, and after making them out kept one, and gave one to the doctor. Dr. Osius never objected to those accounts."

The accounts were received in evidence. The defendant then testified at great length to the correctness of these accounts, the result of which showed a net profit, as he testified, of $1,792.81, saying: "I credited the corporation with $896.41 and myself with $896.40, making a total of $1,792.81," being the amount sued for. He further testified that Dr. Osius knew how he was keeping the books, that the doctor got the statements, saw the books and knew what money defendant was drawing, and no objection was made, or question raised. It is undisputed that the only officers or persons representing the corporation, with whom the defendant ever dealt, were Mr. Muir, its attorney, and Dr. Osius, the secretary and treasurer. Mr. Muir was sworn and denied some of the statements of the

defendant, but Dr. Osius was not sworn as a witness at all, on the trial.

Upon the trial it was the claim of the defendant that under the contract, he was to receive in lieu of salary two cents per pound from the sale of the fish caught by the company, and that he was to have one-half of the profits on all fish purchased from outsiders, and that the only expense to be deducted from these sums was the expense for the labor of running the fish house, and cost of the ice used; that the books kept by defendant, and with which Dr. Osius and Mr. Muir were familiar, showed that, as soon as he started the work, he opened a fish house account in which he entered only the fish house expenses and the purchases and sales of fish; that these books were inspected by Dr. Osius and Mr. Muir frequently, and no protest or objection was made as to this division of the money until after the corporation suspended business; and that the course pursued by defendant was consistent with the letter of Mr. Muir, which related to a form of contract substantially like the one finally signed.

It is urged by defendant that the contract when construed in connection with the nature of the business should be held to be as claimed by him, and that it is unreasonable to hold that by the contract it was intended that the defendant should be compelled to work five years before he could claim any compensation for his labor; and then make such compensation dependent upon whether there had been a net profit in the entire business.

Finally it is urged by defendant that if he is not right in the foregoing contention, then oral evidence was admissible to explain portions of the contract which are ambiguous; and that if the contract was construed by the action or conduct of the parties and by defendant making entries showing that he was being given credit for profits in accordance with his

contention, and the officers of the company knew that he was doing this, and made no protest, then this construction would be binding upon the company.

The defendant, after requesting the court to direct a verdict in his behalf, submitted the following requests to charge, in case the requests to direct a verdict were refused.

"3. The contract entered into in this case contains certain provisions as to what Mr. Andrews was to obtain in lieu of salary. These provisions are not clear, and certain doubt remains after reading the contract, as to its proper interpretation. Evidence has been introduced tending to show that Mr. Andrews' method of keeping the corporation's books required to be kept by the contract, and that monthly statements of the business were rendered to Dr. Osius, and that the method of keeping the books and rendering monthly statements was based upon an interpretation of the contract in accordance with the claim of the defendant herein. If you find such evidence to be true, and that the parties to the contract adopted a construction and interpretation thereof, by their actions, then I instruct you that such interpretation should be also adopted by you in rendering your verdict.

"4. If you find that Mr. Andrews' method of keeping the books, required to be kept under the contract, was known to the corporation, and assented to by it, and that he rendered monthly statements to the corporation, as he has testified, which were accepted without question by the corporation, and if you further find that the method of keeping such books, and rendering such statements showed that the parties themselves had adopted a method of construing this contract, as to how his commissions should be figured, then I instruct you that you should adopt the same method of construing the contract, in arriving at your verdict."

Judgment having been entered on the verdict, the defendant has brought the case here, and by proper assignments of error the same questions are raised, as in the requests to charge. Defendant invokes the

following rule, and cites some of the following authorities:

"Where the parties to a contract have given it a practical construction by their conduct, as by acts in partial performance, such construction is entitled to great, if not controlling, weight in determining its proper interpretation." 13 Corpus Juris, p. 546; *Switzer* v. *Manufacturing Co.*, 59 Mich. 488; *Farnsworth* v. *Fraser*, 137 Mich. 296; *Axe* v. *Tolbert*, 179 Mich. 556; *Ardis* v. *Railway Co.*, 200 Mich. 400; *Brown* v. *A. F. Bartlett & Co.*, 201 Mich. 268.

We are of the opinion that there is much force in this claim of the defendant. The contract, in its terms referred to, is obscure and ambiguous. The practical construction of such provisions by the parties was material, and involved a question of fact which should have been submitted to the jury.

We think that the court erred in directing a verdict for the plaintiff, and in refusing to submit the case to the jury, and in refusing to give defendant's third and fourth requests to charge.

But it is urged by the plaintiff, and appears to have been held by the trial court, that the rule above stated cannot apply here, because the action is brought by the trustee in bankruptcy. Upon this record the trustee is suing in right of the bankrupt, relying upon the contract of the corporation. The question is, What was that contract? We think that the corporation had the right to make the contract as claimed by the defendant. See authorities cited in *Courtney* v. *Youngs*, 202 Mich. 384.

It is also urged by the defendant that the court erred in entering a judgment in trover. If it shall, however, turn out that the money taken by the defendant was the money of the corporation at all times, as claimed by the plaintiff, the same having been demanded, we are of the opinion that trover would lie for its conversion. *Hogue* v. *Wells*, 180 Mich. 19;

*Reed* v. *McCready,* 170 Mich. 532; *Pierce* v. *Underwood,* 103 Mich. 62; *Bearss* v. *Preston,* 66 Mich. 11.

Mistake, or ignorance, or even belief that the money belonged to a defendant "does not constitute a defense in trover." *Tidey* v. *Kent Circuit Judge,* 179 Mich. 580, 586.

For the error pointed out the judgment of the court below is reversed and a new trial granted, with costs to the appellant.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.